## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **NIZHONI HEALTH SYSTEMS LLC,** <br> **d/b/a INNOVIVE HEALTH,** | ) <br> ) <br> ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) |
| **v.** | ) <br> ) |
| | ) **Case No. 22-cv-11212-DJC** |
| **NETSMART TECHNOLOGIES, INC.,** | ) <br> ) <br> ) |
| **Defendant.** | ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **May 25, 2023**

### I.   Introduction

Plaintiff Nizhoni Health Systems, LLC ("Nizhoni"), doing business as Innovive Health

("Innovive"), has filed this lawsuit against Defendant Netsmart Technologies, Inc. ("Netsmart"),

relating to a contract between the parties to develop an electronic medical records ("EMR")

solution. D. 1-1. Specifically, Innovive alleges breach of contract (Count I), breach of the implied

covenant of good faith and fair dealing (Count II), unjust enrichment (Count III), negligent

misrepresentation (Count IV), and violations of Mass. Gen. L. c. 93A, *et seq.* (Count V). Id. at 6–

9. Netsmart has moved for dismissal as to all claims. D. 12. For the reasons stated below, the

Court ALLOWS Netsmart's motion to dismiss as to the unjust enrichment, negligent

misrepresentation, and Chapter 93A claims, and insofar as Innovive sought to recover damages

for both its breach of contract and breach of the implied covenant of good faith and fair dealing

claims, but DENIES it otherwise as to the breach of contract and breach of the implied covenant of good faith and fair dealing claims.  Id.

## II.      Standard of Review

A defendant may move to dismiss for a plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To withstand a Rule 12(b)(6) challenge, the Court must determine if the complaint "plausibly narrate[s] a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (citations omitted).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id. (citation omitted).  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id. (citation omitted).  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 678).

## III.     Factual Background

The following facts are drawn from Innovive's complaint, D. 1-1, and the exhibits attached thereto, D. 1-3 at 16–87, and are accepted as true for the purpose of resolving the pending motion to dismiss.

In March 2016, Innovive contracted with Allscripts Healthcare Solutions ("Allscripts") to provide Innovive with a configurable EMR software solution.  D. 1-1 ¶ 7.  One month later in April 2016, Netsmart acquired the part of Allscripts' business that executed that contract.  Id.  After

three years, Netsmart allegedly failed to deliver the EMR, so Innovive sought to terminate its contract for material breach.  Id. ¶¶ 8–9.  By this point, Innovive had already paid Netsmart $1,249,923.60.  Id. ¶ 10.  The parties engaged in subsequent negotiations, during which Netsmart allegedly promised Innovive that it could still provide the EMR solution and represented that its software already included "critical go-live functionalities that Innovive clearly indicated were essential."  Id. ¶¶ 11–12.  Accordingly, the parties entered into the Master Agreement on December 27, 2019.  Id. ¶ 13; D. 1-3 at 24.

Pursuant to the Master Agreement, Netsmart would provide and license its myUnity software solution to Innovive and develop specific enhancements to its software solution.  D. 1-1 ¶¶ 14, 16; D. 1-3 at 29, 54–56.  According to the Master Agreement's Statement of Work ("SOW"), the project's duration was "expected to be 32 weeks from Project Launch to Go-Live," but the SOW also makes clear that the "project start, and end dates are estimates, and are subject to adjust based upon the Effective Date of the Agreement and both parties' overall cooperation of such implementation."  D. 1-1 ¶ 15; D. 1-3 at 52.  The termination provision states in relevant part:

> If either party is in default of any of its material obligations of this Master Agreement, and has not commenced cure within ten (10) days and effected cure within thirty (30) days of receipt of written notice of default from the other party (the "non-defaulting party"), then the non-defaulting party may terminate the Master Agreement on written notice to the defaulting party; provided that termination and cure provisions of each addendum, schedule, and exhibit, including the SOW, shall control with respect to such addendum, schedule, and exhibit.

D. 1-1 ¶ 17; D. 1-3 at 33.  Furthermore, the Master Agreement outlines how the parties must address any disputes before resorting to litigation:

> The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement by negotiation.  In the event they are unable to resolve the dispute, the parties agree to submit the dispute to confidential mediation under the then current CPR Mediation Procedure . . . before resorting to litigation.

D. 1-1 ¶ 18; D. 1-3 at 35.  Finally, the Master Agreement contains a choice-of-law provision, designating that the contract "will be construed in accordance with the laws of the State of Kansas." D. 1-3 at 34.

Throughout the parties' contractual relationship, Innovive alleges that Netsmart did not meet its contractual relationships, such as by "repeatedly promis[ing] to provide a demonstration of the [EMR] organization structure, . . . [b]ut . . . never provid[ing] Innovive with this promised demonstration," by "fail[ing] to meet multiple development deadlines under the SOW," and by "fail[ing] to develop an EMR that met even the bare minimum standards as required by MassHealth regulations."  D. 1-1 ¶¶ 20–22.  Accordingly, pursuant to the termination provision, Innovive gave Netsmart written notice of default on October 9, 2020, January 31, 2022, and February 21, 2022.  Id. ¶ 23.  Netsmart allegedly did not acknowledge receipt of the notices and did not commence or effectuate cures of any of the issues Innovive identified in the notices.  Id. ¶ 25.  Instead, Innovive alleges Netsmart "ignored [its] communications, employed delay tactics, or proposed solutions requiring additional payments."  Id. ¶ 26.

On May 16, 2022, Innovive sent Netsmart a written "Notice of Termination, Demand for CPR Mediation, and Demand for Compensation."  Id. ¶ 30; D. 1-3 at 17–22.  The notice informed Netsmart that Innovive terminated the Master Agreement, demanded compensation for money and resources expended, and requested that Netsmart provide the earliest possible date to arrange a mutually convenient mediation to resolve the dispute.  D. 1-1 ¶ 31; D. 1-3 at 17, 22.  During several email and letter exchanges between the parties in the ensuing weeks, Netsmart denied that it had failed to deliver on the Master Agreement and repeatedly failed to provide potential dates for mediation.  D. 1-1 ¶¶ 32–36.

## IV.   Procedural History

Innovive instituted this action on June 28, 2022.  D. 1-1.  Netsmart removed the action to this Court on July 28, 2022, D. 1, and now has moved for dismissal, D. 12.[1]  The Court heard the parties on the instant motion and took the matter under advisement.  D. 22.

## V.   Discussion

### A.   <u>Contractual Statute of Limitations</u>

Before proceeding to the merits of Innovive's individual claims, Netsmart argues that all Innovive's claims are time-barred because the Master Agreement states that "[n]o action, regardless of form, arising out of this Master Agreement will be brought more than one (1) year after the cause of action accrues."  D. 1-3 at 35.  In Netsmart's view, because Innovive alleges that it notified Netsmart of the alleged defaults and deficiencies in its performance on October 9, 2020 and Innovive did not bring this action until nearly two years later, all the claims are time-barred. D. 13 at 21.

At the outset, the Court highlights that dismissal upon the basis of an affirmative defense, such as a contractual statute of limitations, is warranted only where the defense is readily apparent on the face of the pleadings.  See <u>Blackstone Realty, LLC v. Fed. Deposit Ins. Co.</u>, 244 F.3d 193, 197 (1st Cir. 2001); <u>Aldahonda-Rivera v. Parke Davis & Co.</u>, 882 F.2d 590, 592 (1st Cir. 1989). Here, it is not clear that any of Innovive's claims, particularly those non-contractual claims, are beyond this limitations period, even assuming it applies to all the claims asserted.  The Master Agreement prohibits the parties from "resorting to litigation" before "attempt[ing] in good faith to resolve any dispute . . . by negotiation" and before "submit[ing] the dispute to confidential

---

[1]Netsmart's motion to dismiss makes a passing reference to a motion to strike, but its memorandum makes no mention of same, D. 12 at 1; <u>see generally</u> D. 13, and accordingly there is no basis for the Court to consider same.

mediation." D. 1-3 at 35. Innovive alleges that it attempted to mediate its disputes back in May 2022, D. 1-1 ¶¶ 30–36, so it is unclear whether it could have brought its claims sooner without violating the Master Agreement, which Netsmart does not address, D. 21-1 at 6–8. Accordingly, Innovive's claims, at best, are timely. At worst, it is unclear whether the contractual claims are time-barred, which prohibits this Court from dismissing the claims on this basis at this juncture.[2]

B. **Breach of Contract (Count I)**

According to Kansas law,[3] a breach of contract claim has five elements: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." Stechschulte v. Jennings, 297 Kan. 2, 23 (2013) (citations omitted). At issue here is only the fourth element—namely, whether Innovive has plausibly alleged that Netsmart breached the Master Agreement. The complaint specifically alleges two breaches: (1) Netsmart failed to deliver the contracted-for EMR solution; and (2) Netsmart ignored or declined Innovive's efforts to resolve the instant dispute through negotiation and mediation as required by the Master Agreement.[4] D. 1-1 ¶¶ 39–40.

---

[2]Because this conclusion, the Court does not reach the parties' arguments regarding the contractual provision about remediation cycles and its effect, or lack thereof, on the contractual statute of limitations. D. 19 at 23–25; D. 21-1 at 6–8.

[3]As the Master Agreement contains a choice-of-law provision designating Kansas law as the law governing the contract, D. 1-3 at 34, and both parties agree that Counts I–II for breach of contract and breach of the implied covenant of good faith and fair dealing are governed by Kansas law, D. 13 at 11; D. 19 at 9–10, the Court applies Kansas law to these counts.

[4]The complaint also states that Netsmart "repeatedly promised to provide a demonstration of the organization structure, including by Jul[y] 28, 2021," which it allegedly never did, and that

As to the first alleged breach, Netsmart raises two arguments.  First, it contends that Innovive did not identify any specific contractual provision that Netsmart violated by failing to deliver the EMR solution.  D. 13 at 12.  While no specific contractual provision was included in the complaint in reference to this breach, the purpose of the Master Agreement was the delivery of an EMR solution, D. 1-3 at 24 (identifying that this "Master Agreement for Term Licensed Software, Hosting, and Services sets forth the terms and conditions under which Netsmart shall license the software programs and provide hosting and support services described herein"); 29 (identifying the scope of the Master Agreement), so it is at least plausibly alleged that Netsmart is on notice of its purported breach.  See Larson v. Van Wyck, No. 107,440, 2013 WL 3455785, at *3 (Kan. Ct. App. July 5, 2013) (citation and internal quotation marks omitted).

Second, Netsmart argues that it could not have breached the contractual requirement that it deliver the EMR solution in thirty-two weeks, because that provision explicitly states that the thirty-two weeks is simply an "expect[ation]."  D. 1-3 at 52; D. 13 at 12–13.  Consequently, Netsmart contends that, without express language to the contrary, the Master Agreement does not impose an obligation to complete the project in thirty-two weeks.  D. 13 at 13.  In support of its argument, Netsmart cites to Sacred Leaf, LLC v. Riahi, No. 123,360, 2022 WL 128895, at * 5 (Kan. App. Ct. Jan. 14, 2022), but there, the court explained that "[g]enerally, the time of performance is not material to a contract unless it is expressly stated or implied from the nature of the contract or circumstances under which it was negotiated. . . .  In contrast, when a contract includes specific dates for performance or includes a written provision stating that time is of the

---

Netsmart "failed to meet multiple development deadlines under the SOW," which is attached to the Master Agreement.  D. 1-1 ¶¶ 20–21.  Innovive, however, does not identify any contractual provision, which Netsmart's alleged failure to provide a demonstration violates and it also does not specify which deadlines Netsmart failed to meet.  Accordingly, the Court has not addressed these alleged breaches of contract in its analysis.

essence then performance should be completed by the set dates." Id. (citing Campbell v. Fowler, 214 Kan. 491, 496–97 (1974)).  Here, while there was no time-is-of-the-essence clause, the Master Agreement includes specific dates for performance.  For example, it specifies that the "Go-Live Date" is defined as the earlier of two dates:  "(1) November 1, 2020, unless extended by written agreement of the Parties or terminated under the Agreement; or (2) that date prior to November 1, 2020, identified as the Go Live Date in a written notice from Client to Netsmart and accepted by Netsmart, such acceptance not to be unreasonably withheld or delayed."  D. 1-3 at 67.  And even assuming *arguendo* that the Master Agreement included no specific dates, Kansas law implies "a reasonable time for completion of a contract . . . when a contract, which establishes the parties' agreement on other essential terms, does not specify the time for performance or the performance of a necessary event."  Int'l Power Mach. V. Midwest Energy, Inc., 4 F. Supp. 2d 1272, 1275 (D. Kan. 1998) (citing Kansas law).  As the parties "expected" the project to last thirty-two weeks and it has been more than three times that amount of time since they signed the Master Agreement, D. 1-3 at 52, the Court cannot conclude that Innovive has failed to state a breach of contract claim on this basis.

As to the second breach, Innovive alleges Netsmart breached the provision to attempt to resolve their differences by negotiation and, if not, submit to mediation, D. 1-3 at 35, particularly where it requested three times that Netsmart provide dates for a mutually convenient mediation, but Netsmart never provided any dates.  D. 1-1 ¶¶ 30–36, 40.  As an initial matter, Innovive does not allege that Netsmart explicitly declined to mediate.  Id.  Rather, it alleges that Netsmart replied to Innovive's letters and emails to deny the allegations levied against it and did not offer any dates for mediation.  Id. ¶¶ 32, 34.  And while Innovive stated in a May 31, 2022 letter that it would consider Netsmart in further breach of the Master Agreement if Netsmart did not provide dates for

mediation, id. ¶ 35, the contract imposes no temporal limitation describing by when the parties would need to mediate, see D. 1-3 at 35.  On a motion to dismiss, however, all that is required of Innovive is factual allegations that present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley, 657 F.3d at 46 (quoting Iqbal, 556 U.S. at 678).  As such, the Court cannot conclude Innovive has failed to state a claim.[5]

For all of these reasons, Netsmart's motion to dismiss Innovive's breach of contract claim, Count I, is denied.

## C.    Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

There is an implied duty of good faith and fair dealing inherent in all contracts governed by Kansas law.  Waste Connections of Kan., Inc. v. Ritchie Corp., 296 Kan. 943, 965 (2013) (citing cases); see Bonanza, Inc. v. McLean, 242 Kan. 209, 222 (1987).  However, "there is no separate claim for breach of the duty of good faith and fair dealing; it is merely a legal argument related to a breach-of-contract claim."  Classico, LLC v. United Fire and Cas. Co., No. 114,833, 2016 WL 7324451, at *5 (Kan. Ct. App. Dec. 16, 2016).  As such, "[i]n order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for breach of contract, not a separate cause of action for breach of duty of good faith, and (2) point to a term in the contract which the defendant[] allegedly violated by failing to abide by the good faith spirit of that term."  Id. (second alteration in original) (quoting Wayman v. Amoco Oil Co., 923 F. Supp. 1322, 1359 (D. Kan. 1996)) (internal quotation marks omitted).

---

[5]In response to this allegation, Netsmart argues that any breach based upon its alleged failure to mediate is moot, because the parties have now mediated. D. 13 at 17 n.5. Innovive notes that Netsmart did not agree to mediation until after Innovive filed this lawsuit and sought damages for same, D. 1-1 ¶¶ 40–41; D. 19 at 16 n.14, which means the fact that the parties have mediated does not moot the breach of contract claim on this basis.

Innovive alleges Netsmart violated its duty "through an extreme lack of diligence," as it has not yet delivered the EMR solution, and through its "ignoring or declining to honor clear, rational, and good faith efforts to resolve the contractual dispute between the parties through negotiation and mediation, as outlined under § 17(j) of the [Master Agreement]." D. 1-1 ¶¶ 44–48. These are the same violations that undergird Innovive's breach of contract claim, and, as articulated above, the Court has already determined that Innovive's breach of contract claim survives dismissal. Innovive has pointed to contractual terms which the Netsmart allegedly violated by failing to abide by duty of good faith implied therein. Id. Accordingly, it has sufficiently plead the elements to prevail on an implied duty of good faith and fair dealing.[6]

While Innovive cannot maintain a separate cause of action for breach of the duty of good faith and fair dealing, the allegations undergirding Count II are "anchored" in the breach of contract claim alleged in Count I, which is sufficient to survive dismissal. See, e.g., Nathan C. Niles D.D.S., LLC v. AMCO Ins. Co., No. 21-1163-JAR-GEB, 2021 WL 5161761, at *3 (D. Kan. Nov. 5, 2021) (declining "to dismiss the allegations in Count III on th[e] basis [that a separate cause of action for breach of the duty of good faith and fair dealing cannot be maintained] because they are 'anchored' in the breach of contract claim alleged in Count I" (citing cases)); H & L Assocs. of Kan. City, LLC v. Midwestern Indem. Co., No. 12-CV-2713-EFM-DJW, 2013 WL 3854484, at *4 n.29 (D. Kan. July 25, 2013) (same). Innovive, however, "cannot recover damages for both [its] breach of contract and breach of duty of good faith and fair dealing claims if [it] prevail[s] on each one." Nathan C. Niles D.D.S., LLC, 2021 WL 5161761, at *3 (alterations in original) (quoting Welton

_____

[6]Netsmart appears to argue that dismissal of this claim is warranted because "Innovive bases its implied covenant claim solely on express provisions of the Master Agreement." D. 13 at 16–17. This ignores, however, that Kansas law requires breach of the duty of good faith and fair dealing claims to be premised upon specific contractual provisions. Classico, LLC, 2016 WL 7324451, at *5.

v. AMCO Ins. Co., No. 14-CV-4066-DDC-KGG, 2015 WL 5604253, at *3 n.2 (D. Kan. Sept. 23, 2015)) (internal quotation marks omitted).  To the extent Innovive seeks to recover damages for both claims, Netsmart's motion is granted.  Id.

### D.      Unjust Enrichment (Count III)

A claim for unjust enrichment requires that a plaintiff show:  "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value."  Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (citation and internal quotation marks omitted).[7]  Even assuming the complaint plausibly alleges these elements, Netsmart argues that dismissal is nevertheless warranted because a valid contract—namely, the Master Agreement—"already defines the parties' relevant obligations."  D. 13 at 16.  Innovive, on the other hand, argues that it is allowed to plead alternative claims pursuant to Rule 8(d)(2).  D. 19 at 23.

While it is "not uncommon for an unjust enrichment claim to proceed, in the alternative, with a breach of contract claim beyond the motion to dismiss stage," Duncan v. Nissan N. Am., Inc., 305 F. Supp. 3d 311, 323 (D. Mass. 2018) (citing Lass v. Bank of Am., N.A., 695 F.3d 129,

---

[7]The parties dispute whether the choice-of-law provision in the Master Agreement applies to Innovive's claim for unjust enrichment.  D. 13 at 11; D. 19 at 9–10; see Dinan v. Alpha Networks, Inc., 764 F.3d 64, 68–69 (1st Cir. 2014).  Ultimately, the Court need not decide the issue because "[t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions."  Reicher v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 4 (1st Cir. 2004) (citation omitted).  The elements of unjust enrichment are substantially similar in Kansas and Massachusetts.  See Univ. of Kan. Hosp. Auth. v. Bd. Of Comm'rs of Wabaunsee, 299 Kan. 942, 960 (2014).  Accordingly, the Court "need not make a finding regarding which state's law is to be applied where the case's resolution would be identical under either state's law."  Fine v. Guardian Life Ins. Co. of Am., 450 F. Supp. 3d 20, 34–35 (D. Mass. 2020) (quoting Fratus v. Republic W. Ins. Co., 147 F.3d 25, 28 (1st Cir. 1998)) (internal quotation marks omitted).

140 (1st Cir. 2012)), that is only the case "where there is a dispute over the existence, scope, or enforceability of the putative contract," Alantra LLC v. Apex Indus. Techs. LLC, No. 20-10852-FDS, 2022 WL 11218101, at *8 (D. Mass. Oct. 19, 2022) (quoting Grossman v. Geico Cas. Co., No. 21-2789, 2022 WL 1656593, at *3 (2d Cir. May 25, 2022)) (internal quotation marks omitted). Here, there is no such dispute and both parties agree that the Master Agreement is an enforceable contract.  See, e.g., Neff Grp. Distribs., Inc. v. Cognex Corp., No. 22-11270-NMG, 2022 WL 17156025, at *5 (D. Mass. Nov. 22, 2022) (dismissing unjust enrichment claim where parties' relationship was governed by an enforceable contract); Ruiz v. Bally Total Fitness Holding Corp., 447 F. Supp. 2d 23, 29 (D. Mass. 2006) (same).

Accordingly, the Court allows Netsmart's motion to dismiss Innovive's claim for unjust enrichment, Count III.

### E.   Negligent Misrepresentation (Count IV)

To state a claim for negligent misrepresentation, a plaintiff must allege that the defendant: "(1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information."  Braunstein v. McCabe, 571 F.3d 108, 126 (1st Cir. 2009) (quoting Gossels v. Fleet Nat'l Bank, 453 Mass. 366, 372 (2009)) (internal quotation marks omitted).[8]  To determine whether Innovive has stated a claim, the Court must first determine whether it is subject to Rule 9(b)'s heightened pleading requirements.

---

[8]The parties also dispute whether the choice-of-law provision in the Master Agreement applies to Innovive's claim for negligent misrepresentation.  D. 13 at 11; D. 19 at 9–10.  As the elements of negligent misrepresentation under Kansas and Massachusetts law are largely the same, compare Braunstein, 571 F.3d at 126 with Stechschulte, 297 Kan. at 22, the Court need not resolve the issue.

Rule 9(b) applies to claims "where the core allegations effectively charge fraud." N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009); see Plante & Moran, PLLC v. Andover Healthcare, Inc., No. 17-cv-10093-DJC, 2018 WL 935423, at *4 (D. Mass. Feb. 16, 2018).   By Innovive's own concessions, its negligent misrepresentation claim effectively charges fraud.  See, e.g., D. 19 at 14 (stating that "the facts in this case demonstrate deceit and intentional misbehavior" not "basic negligence"); id. at 15 (describing the misrepresentations undergirding its negligent misrepresentation claim as "deliberate falsehoods" and "intentional and deceitful representations"); id. (stating that "there is ample evidence that Defendant's misrepresentations constitute 'fraud,' 'deceit' or 'egregious or intentional misbehavior'").   Accordingly, the Court applies Rule 9(b) to Innovive's claim.  Pursuant to Rule 9(b), the pleading "party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  To comport with this standard, the pleading must "'specify the statements that the plaintiff contends were fraudulent' and why they were fraudulent, . . . and otherwise 'allege with particularity the who, what, when, where, and how of the fraud.'"  Plante & Moran, PLLC, 2018 WL 935423, at *4 (quoting Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997), and D'Agostino v. ev3, Inc., 845 F.3d 1, 10 (1st Cir. 2016)).

The extent of Innovive's allegations in the complaint regarding the negligent misrepresentations is as follows:  (1) "[d]uring the 2019 negotiations, Defendant failed to exercise reasonable care when communicating the capabilities of its proposed EMR solution, misrepresenting that its software included critical go-live functionalities that Innovive indicated were essential;" (2) "Defendant misrepresented that it could deliver an EMR solution that met Innovive's specifications;" (3) "Innovive reasonably relied on these misrepresentations, causing it to enter into a contractual relationship with Defendant;" (4) "[t]o Innovive's surprise, Defendant's

EMR solution never included these critical go-live functionalities;" (5) "Defendant failed to deliver on its end of the bargain;" and (6) "Defendant also acknowledged that it is incapable of satisfying the [Master Agreement]."  D. 1-1 ¶¶ 55–60.  The attached Notice of Termination includes no further allegations in this regard.  D. 1-3 at 17–22.  These allegations fall short of Rule 9(b)'s heightened pleading standard.

First, Innovive fails to specify the statements that it contends were false.  For example, nowhere in the complaint or attached documentation does Innovive delineate which "critical go-live functionalities" Netsmart represented its software already included.  This is especially significant where Innovive contracted for Netsmart to develop specific enhancements to its myUnity solution.  D. 1-3 at 53–56.  Second, Innovive does not allege who made these representations to it.  See N.H. Elec. Coop., Inc. v. Elster Sols., LLC, No. 16-cv-440-PB, 2017 WL 2861667, at *3 (D.N.H. July 5, 2017) (concluding negligent misrepresentation claim satisfied Rule 9(b)'s pleading requirement, in part, where documents supplied by the plaintiff indicated that "senior vice president" and specific employee of defendant company made the misrepresentations).  Third, Innovive has not provided the "when" of the misrepresentations.  While it alleges that they were made "[d]uring the 2019 negotiations," this does not provide the particularity Rule 9(b) requires.  See Plante & Moran, PLLC, 2018 WL 935423, at *5 (concluding negligent misrepresentation claim failed to satisfy Rule 9(b)'s pleading requirement where, in part, the pleading did not include "the time when the purported misstatements occurred" and plaintiff's explanation that the misstatements "'naturally precede[d] actually entering into a contract,' and the dates of the contracts are known" leaves "the time period at issue . . . no more specific than some date prior to entry into three separate contracts").  Lastly, the pleading provides no context

or circumstances surrounding the misrepresentations for the Court to deduce the "where" or "how"

necessary to satisfy Rule 9(b).

Accordingly, Netsmart's motion to dismiss is allowed as to Innovive's claim for negligent

misrepresentation, Count IV.[9]

### F.   <u>Chapter 93A (Count V)</u>

Because the Master Agreement is governed by Kansas law, D. 1-3 at 34, Netsmart argues

that Count V, the Chapter 93A claim, should be dismissed because Innovive "cannot assert causes

of action arising under Massachusetts law for breach of a contract that is to be construed according

to Kansas law," D. 13 at 17; <u>see</u> <u>Neuro-Rehab Assocs., Inc. v. AMRESCO Com. Fin., L.L.C.</u>, No.

05-cv-12338-GAO, 2006 WL 1704258, at *10 (D. Mass. June 19, 2006) (explaining that "the

claims of violations of Chapter 93A, a Massachusetts statutory provision, are not claims arising

under Idaho law and accordingly cannot be maintained" (citation omitted)).   Innovive counters

that the choice-of-law provision "is expressly self-limiting" and, as a result, it does not apply to its

extra-contractual claims, such as the alleged Chapter 93A violations.  D. 19 at 10, 18.

The Master Agreement's choice-of-law provision states in relevant part:  "[t]his Master

Agreement will be construed in accordance with the laws of the State of Kansas, without giving

effect to the conflict of law rules thereof."  D. 1-3 at 34.  This language does not include common

contractual phrases, such as "relating to," "arising under," "connected with," or "incident to,"

which would suggest the provision applies to extra-contractual claims.  <u>See</u> <u>Vertex Surgical, Inc.</u>

<u>v. Paradigm Biodevices, Inc.</u>, 390 F. App'x 1, 2–3 (1st Cir. 2010) (explaining that "the phrase[s]

'relating to, arising under, connected with, or incident to this Agreement' cover[] a lot more ground

---

[9]As the Court dismisses Innovive's claim for negligent misrepresentation on the grounds
that it fails to satisfy Rule 9(b), it does not reach Netsmart's alternative challenges to this claim.
D. 13 at 13–16; D. 21-1 at 7–8.

than [contractual language which states simply that 'Massachusetts law exclusively shall govern all terms of this Agreement]").  The Master Agreement includes such broad language elsewhere, further suggesting that extra-contractual claims are not governed by Kansas law.  See, e.g., D. 1-3 at 32 (limiting cumulative liability "for any actual or alleged damages arising out of, based on or relating to this master agreement").  As a matter of contract interpretation, the Court, therefore, concludes that the Master Agreement's choice-of-law provision does not apply to Innovive's extra-contractual claims.

There is ample support for the Court's reading of the choice-of-law provision here.  See, e.g., Ne. Data Sys. v. McDonnell Douglas Comput. Sys., 986 F.2d 607, 609–11 (1st Cir. 1993) (concluding that substantially similar choice-of-law provision applies to Chapter 93A claims that were "embroidered 'breach of contract' claims" but did not apply to Chapter 93A claims that "rest[ed] upon allegations of fraud, not breach of contract"); Comput. Sales Int'l v. Lycos, Inc., No. 05-cv-10017 RWZ, 2005 WL 3307507, at *2 (D. Mass. Dec. 6, 2005) (interpreting substantially similar choice-of-law provisions as "limited to disputes arising out of the contracts"); Jacobson v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572, 575, 580 n.9 (1995) (explaining that a choice-of-law provision stating "only that the agreement is to be governed and construed by California law . . . does not purport to bar the application of [Chapter 93A] to" "claims of precontract deceit and other wrongs that allegedly induced the plaintiffs to sign the franchise agreement"); Conway v. Planet Fitness Holdings, LLC, 101 Mass. App. Ct. 89, 92, 95 (2022) (interpreting choice-of-law provision, which stated in relevant part that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of New Hampshire, without regard to the conflicts of law principles thereof," as "appl[ying] only to disputes arising out of the settlement agreement and not to claims, as here, that allege misleading and negligent conduct that

induced the execution of the settlement agreement"); <u>Kitner v. CTW Transp., Inc.</u>, 53 Mass. App. Ct. 741, 746 (2002) (interpreting substantially similar choice-of-law provision and noting that "[t]he language does not indicate that North Dakota law would also cover tortious conduct or unfair acts inducing a breach of the contract" (citation omitted)).[10]

While extra-contractual claims are not governed by the Master Agreement's choice-of-law provision, some of Innovive's Chapter 93A claims do fall within the provision's ambit, because they are "embroidered 'breach of contract' claims." <u>Ne. Data Sys.</u>, 986 F.2d at 609 (citations omitted). Here, Innovive specifically alleges three unfair and deceptive acts: (1) Netsmart misrepresented that its myUnity software already included critical go-live functionalities; (2) Netsmart failed to deliver an EMR solution with the requisite functionalities and, thus, strung Innovive along; and (3) Netsmart ignored or declined Innovive's efforts to resolve the instant dispute through negotiation and mediation as required by the Master Agreement. D. 1-1 ¶¶ 65–70. The latter two allegations relate to Netsmart's contractual obligations and specific contractual provisions. Given the language of the choice-of-law provision, requiring that the "Master Agreement . . . be construed in accordance with the laws of the State of Kansas," D. 1-3 at 34, claims intimately intertwined with breaches of specific contractual obligations and provisions are governed by Kansas law. <u>Ne. Data Sys.</u>, 986 F.2d at 610–11; <u>Comput. Sales Int'l</u>, 2005 WL 3307507, at *2 (explaining that "'embroidered' contract claims or 93A claims essentially sounding

---

[10] Neither of the cases proffered by Netsmart warrant a different conclusion. Both cases applied a choice-of-law provision to a misrepresentation claim because when a defendant's misrepresentation "is alleged to have induced the plaintiff to enter into a contract, such a provision in the induced contract may be applied." <u>Colucci, Colucci, Marcus & Flavin, P.C. v. Citizens Bank of Mass.</u>, No. 15-13536-GAO, 2018 WL 1567605, at *2 (D. Mass. Mar. 30, 2018); <u>Neuro-Rehab Assocs., Inc.</u>, 2006 WL 1704258, at *9. Arguably, these claims went to the "enforceability" and "validity" language of the choice-of-law provision at least in the latter of these cases, <u>id.</u> at *8-9, which is broader language than in the choice-of-law provision here.

in contract fall within the purview of choice-of-law provisions governing contracts" (quoting Ne.
Data Sys., 986 F.2d at 609–10)).

In a similar case, the First Circuit reached the same conclusion.  In Ne. Data Sys., two
companies entered into a contract, which contained the following choice-of-law provision:  "[t]his
Agreement and the rights and obligations of the parties hereto shall be governed by and construed
in accordance with the laws of California."  Ne. Data Sys., 986 F.2d at 609.  The plaintiff brought
several claims against the defendant, including one for violation of Chapter 93A.  Id. at 608.  The
lower court dismissed the Chapter 93A claim because it "reasoned that the 93A claims so closely
resembled the contract and fraud claims that the parties must have agreed 'implicitly' to try those
claims under California law as well" and "concluded that, since California has no 93A-type of law,
he must dismiss [the plaintiff's] 93A claims."  Id. at 609.  On appeal, the First Circuit concluded
that the plaintiff's Chapter 93A claims which were simply "embroidered 'breach of contract'
claims" fell within the ambit of the choice-of-law provision, while the Chapter 93A claims that
involved fraud during the negotiation of the contract did not.  Id. at 609–11.  The court explained
that the relevant question was not whether plaintiff's additional allegations that the breaches of
contract were made "willfully," "knowingly," or with "rascality" stated a Chapter 93A claim, but
rather whether those allegations "t[ook] th[o]se claims outside the scope of contractual language"
and concluded "that they d[id] not."  Id. at 609.  Ultimately, the court held that "the parties, in their
choice-of-law provision, meant that California law would govern both ordinary and 'rascal-like'
breach of contract claims."  Id. at 610; see Scheck v. Burger King Corp., 756 F. Supp. 543, 545–
46, 546 n.1 (S.D. Fla. 1991) (concluding that choice-of-law provision in franchise agreement that
says the agreement "shall be governed and construed under and in accordance with the laws of the

State of Florida" applies to bar Chapter 93A claims which incorporate contract claims and would not exist without the agreement).

Likewise, in the case at bar, "[t]he contract violations are essential elements of [Innovive's Chapter] 93A claims," regarding the delivery of an EMR solution and failure to negotiate and mediate. Ne. Data Sys., 986 F.2d at 609. Innovive's additional allegation that Netsmart engaged in these breaches "willfully, knowingly, and repeatedly," D. 1-1 ¶ 65, "add little" to the claim and do not remove it from the choice-of-law provision's purview, Ne. Data Sys., 986 F.2d at 609. Accordingly, the Master Agreement's choice-of-law provision applies to these claims, and dismissal is appropriate because Massachusetts statutory claims do not arise under Kansas law. See Neuro-Rehab Assocs., Inc., 2006 WL 1704258, at *10.[11]

Turning to the final Chapter 93A claim regarding Netsmart's misrepresentations that its myUnity software already included critical go-live functionalities, dismissal is also warranted because it does not satisfy Rule 9(b)'s heightened pleading requirement. The allegations in the complaint undergirding this claim are the same as those undergirding Innovive's negligent misrepresentation claim, which the Court already determined effectively charge fraud and are

---

[11] Application of the choice-of-law provision comports with Massachusetts conflict of laws rules. Massachusetts law allows parties to choose the law that will apply to their contractual relationship, only if the application of same will not contravene Massachusetts' public policy and the state whose law is chosen has some substantial relation to the contract. Dykes v. Depuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998) (citing Steranko v. Inforex, Inc., 5 Mass. App. Ct. 253, 260 (1977)). Here, Kansas certainly has a substantial relation to the contract as that is where Netsmart is headquartered and from where it allegedly developed its myUnity solution. D. 1-1 ¶ 3; D. 13 at 17. Innovive suggests that application of Kansas law would violate Massachusetts policy because Massachusetts "has a materially greater interest than K[ansas] in this dispute" and Kansas "has no comparable provision to" Chapter 93A. D. 19 at 10 n.8. The First Circuit reached the opposite conclusion in Ne. Data Sys., where it explained that "[t]here is no conflict with Massachusetts public policy here" where "[t]he dispute is essentially a private one." Ne. Data Sys., 986 F.2d at 610 (citation and internal quotation marks omitted). The same can be said here.

deficient.  Chapter 93A claims that effectively charge fraud must satisfy this standard.  See, e.g., Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 21–22 (1st Cir. 2017) (observing that the Rule 9(b) heightened pleading standard applies to claims under Chapter 93A whose "core allegations effectively charge fraud" (citations and internal quotation marks omitted)); Martin v. Mead Johnson Nutrition Co., No. 09-11609-NMG, 2010 WL 3928707, at *3 (D. Mass. Sept. 30, 2010) (stating that "[a] claim under Chapter 93A that involves fraud is subject to the heightened pleading requirement" (citation omitted)).  Here, the allegations do not satisfy this standard, so dismissal is appropriate.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Netsmart's motion to dismiss, D. 12, as to Count III for unjust enrichment, Count IV for negligent misrepresentation, and Count V for violations of Chapter 93A, and insofar as Innovive sought to recover damages for both its breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count II) claims.  Netsmart's motion to dismiss is DENIED otherwise as to Counts I and II.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge